**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

GABRIELLA JARROTT,
as Personal Representative of the
Wrongful Death Estate of Darian Jarrott,

      Plaintiff,

v.                                                       Civ. Case No. 22-298 KRS/GBW

MARK MADRID, in his individual capacity, and
NEW MEXICO STATE POLICE CHIEF
TIM Q. JOHNSON,

      Defendants.

**MEMORANDUM OPINION AND ORDER**
**GRANTING DEFENDANTS' MOTION TO DISMISS**

      THIS MATTER is before the Court on Defendants' Motion to Dismiss and Memorandum in Support Thereof, (Doc. 7), filed June 10, 2022.  On August 10, 2022, Plaintiff filed a response opposing the Motion to Dismiss, and Defendants filed a reply on August 25, 2022.  (Docs. 20 and 30).  Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct dispositive proceedings in this matter and to enter a final judgment.  (Docs. 26 and 27). Having considered the parties' briefing, record of the case, and relevant law, the Court grants Defendants' Motion to Dismiss.

**I.**    **Background**

      For the purpose of ruling on Defendants' Motion to Dismiss, the Court assumes that the following facts, taken from the Complaint, are true.  *See Mayfield v. Bethards*, 826 F.3d 1252, 1255 (10th Cir. 2016) ("In reviewing a motion to dismiss, [the Court] accept[s] the facts alleged in the complaint as true and view[s] them in the light most favorable to the plaintiff.").  In January and early February 2021, federal agents from Homeland Security Investigations ("HSI")

were investigating Omar Felix Cueva for drug trafficking.  (Doc. 1) at 3.  Mr. Cueva had an extensive criminal record and "was known to have a violent history."  On or about January 28, 2021, during a purchase of methamphetamine from Mr. Cueva, an undercover HSI agent observed that Mr. Cueva was in possession of an AK-47 style semi-automatic rifle.  Mr. Cueva told the agent that if he got caught, he would not go back to jail.  *Id.*

Using a confidential informant, agents set up another transaction with Mr. Cueva to take place on February 4, 2021.  To protect the confidential informant, HSI agents sought assistance from the New Mexico State Police ("NMSP") to pull Mr. Cueva over on a routine traffic stop as he travelled from Deming to Las Cruces, New Mexico.  *Id.* at 3-4.  On February 2, 2021, two HSI agents contacted Defendant Madrid and requested his assistance with providing backup for the traffic stop.  *Id.* at 4.  Defendant Madrid was provided "full disclosure of [HSI's] investigation into Cueva, including but not limited to the drugs Cueva sold to an undercover agent, the fact that he always carried a firearm, that he was a dangerous felon with a dangerous criminal history, and he was paranoid about being set up by law enforcement."  *Id.*  NMSP K-9 Officer Leonel Palomares was also informed about Mr. Cueva and the plan to pull him over, and Officer Palomares "advised HSI agents that he would want to get another officer involved to assist him with any traffic stop of Cueva in which he participated."  *Id.*

On the morning of February 4, 2021, HSI agents held a briefing about the planned operation.  *Id.*  Officer Palomares and NMSP Officer Alfonso Montez were paired together to travel on Interstate 10 to look for Mr. Cueva's vehicle.  *Id.* at 5.  Officer Palomares told Officer Montez that he "had a bad feeling about this" and planned to change his normal tactics if they were to encounter Mr. Cueva.  *Id.*  The HSI Special Response Team was also on Interstate 10, driving an armored vehicle and wearing tactical and bulletproof equipment, and accompanied by

a medic.  *Id.*  In addition, the HSI issued a BOLO notice (short for "be on the look out") asking

other law enforcement agencies to look for Mr. Cueva and noting that "Mr. Cueva was suspected

of trafficking narcotics, has an extensive criminal history, and is known to carry firearms."  *Id.*

at 6.

      Defendant Madrid, who was Officer Darian Jarrott's supervisor, told Officer Jarrott that

"a suspect might be driving eastbound on Interstate 10 in a white pickup truck, and instructed

him to develop a reason to initiate a traffic stop if he saw the vehicle."  *Id.* at 5.[1]  Officer Jarrott

had not been invited to attend the HSI briefing about Mr. Cueva and was not informed of what

was discussed at the briefing.  *Id.* at 4.  Due to Officer Jarrott's background as an employee with

the Department of Public Safety, which later merged with the NMSP, Officer Jarrott was not

provided with the full training and law enforcement academy curriculum provided to other

NMSP officers.  *Id.* at 4-5.  Defendant Madrid knew of Officer Jarrott's background and lack of

training or experience.  *Id.* at 5.  "The only information Officer Jarrott was given about Mr.

Cueva was from Sgt. Madrid, who merely went over the BOLO with Officer Jarrott."  *Id.* at 6.

      At approximately noon on February 4, 2021, Officer Jarrott saw a white pickup truck

matching the description Defendant Madrid had given him.  Officer Jarrott pulled the pickup

truck over.  *Id.*  Officer Jarrott was alone and approached the truck from the passenger side.

Officer Jarrott engaged the driver, Mr. Cueva, in conversation and then asked Mr. Cueva to step

out of the vehicle and meet him behind the truck bed.  *Id.* at 7.  Mr. Cueva exited the vehicle,

hiding a semi-automatic rifle he had concealed between the driver's seat and the door, raised the

rifle over the truck bed, and shot Officer Jarrott in the torso knocking Officer Jarrott to the

---

[1] Plaintiff does not state when this conversation took place.

ground.  Mr. Cueva then moved around the rear of the vehicle and shot Officer Jarrott several more times at point-blank range, got back in the truck, and drove away.  Officer Jarrott died at the scene as a result of multiple gunshot wounds.  *Id.*  After leading HSI and NMSP agents on a high-speed chase to Las Cruces, Mr. Cueva was ultimately killed in a shootout with various law enforcement agencies.  During the shootout, Mr. Cueva shot and injured a Las Cruces Police Department officer.  *Id.*

Plaintiff Gabriella Jarrott, as the personal representative of the estate of Officer Jarrott, brings this action against Defendants in their individual capacities under 42 U.S.C. § 1983 for violation of Officer Jarrott's constitutional rights.  (Doc. 1) at 1, 10.  Plaintiff brings two claims: 1) that Defendant Madrid violated Officer Jarrott's Fourteenth Amendment right to substantive due process; and 2) for supervisory liability against Defendant Johnson, as New Mexico State Police Chief.  *Id.* at 8-10.  Plaintiff alleges that Defendant Madrid "was directly responsible for placing Jarrott in his vulnerable state and engaging in activity that could produce foreseeable, rapid and deadly consequences," and that Defendant Madrid acted with deliberate indifference by "instructing Jarrott to conduct a traffic stop of Cueva while alone and without backup," "fail[ing] to make any attempt to fully inform or assist Jarrott," and "keeping vital information about Cueva and HSI's investigation to himself and not fully informing Jarrott of the danger he was likely to encounter."  *Id.* at 9.  Regarding Defendant Johnson, Plaintiff alleges that as NMSP Chief, he was "personally responsible for overseeing the training and supervision of NMSP officers, and implementing, upholding, and ensuring the compliance with NMSP's policies and procedures with regard to apprehending suspects while assisting other agencies."  *Id.*  Plaintiff claims that Defendant Johnson's "failure to establish and enforce NMSP policies and procedures regarding the apprehension of suspects while assisting other law enforcement agencies, coupled

4

with inadequate and indifferent training and supervision, resulted in the brutal murder of Jarrott." *Id.* at 10.

Defendants move to dismiss the Complaint on several grounds. First, Defendants argue that Plaintiff's state-created danger claim in Count 1 fails because the risk of private violence is inherent to police work, and Defendants' alleged actions are not "conscience shocking" in light of that inherent risk. (Doc. 7) at 3-10. Second, Defendants move to dismiss Plaintiff's supervisory liability claim in Count 2 because it is based on conclusory allegations and Plaintiff does not establish Defendant Johnson's deliberate indifference to Officer Jarrott's constitutional rights. *Id.* at 10-16. Defendants also argue that Plaintiff's supervisory liability claim should be dismissed because Plaintiff fails to establish an underlying violation of Officer Jarrott's constitutional rights. *Id.* at 21-22. Third, Defendants challenge Plaintiff's assertion that Defendants violated Officer Jarrott's equal protection rights as conclusory and facially inadequate. *Id.* at 16-21. And fourth, Defendants argue that if the Court determines that Plaintiff has adequately stated a claim for relief in either Count 1 or 2, Defendants are nonetheless entitled to qualified immunity because they did not violate clearly established law. *Id.* at 22-26.

In response, Plaintiff argues that Defendants are liable under the state-created danger doctrine because they deprived Officer Jarrott of the opportunity to accept the risk posed by Mr. Cueva and because Defendant Madrid's acts should shock the conscience of the Court. (Doc. 20) at 3-8. Plaintiff further contends she has sufficiently pled a claim for supervisory liability based on Defendant Johnson's failure to establish and enforce policies and procedures for assisting other law enforcement agencies in the apprehension of suspects, specifically with regard to the practice of using pretextual stops and requiring additional precautions for high-risk stops. *Id.* at 8-10. Plaintiff argues that Defendants are not entitled to qualified immunity

5

because the state-created danger doctrine was clearly established by the date of the incident. *Id.* at 10-13.  In their reply, Defendants maintain that Plaintiff has failed to state a claim for relief for Counts 1 and 2, and that they are entitled to qualified immunity.  (Doc. 30).

## II.    Legal Standard

Federal Rule of Civil Procedure 12(b)(6) allows a court to dismiss a complaint for failure to state a claim upon which the court can grant relief.  "[T]o withstand a Rule 12(b)(6) motion to dismiss, a complaint must contain enough allegations of fact, taken as true, to state a claim to relief that is plausible on its face." *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  While a complaint does not require detailed factual allegations to survive a Rule 12(b)(6) motion to dismiss, it "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

"A claim is facially plausible when the allegations give rise to a reasonable inference that the defendant is liable." *Mayfield*, 826 F.3d at 1255.  The court's consideration, therefore, is limited to determining whether the complaint states a legally sufficient claim upon which the court can grant relief.  *See Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999).  The court is not required to accept conclusions of law or the asserted application of law to the alleged facts.  *See Hackford v. Babbitt*, 14 F.3d 1457, 1465 (10th Cir. 1994).  Nor is the court required to accept as true legal conclusions that are masquerading as factual allegations.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The court must, however, view a plaintiff's allegations in the light most favorable to the plaintiff.  *Schrock v. Wyeth, Inc.*, 727 F.3d 1273, 1280 (10th Cir. 2013).

6

III.   **Analysis**

   **A. Count 1**

   In Count 1, Plaintiff claims that Defendant Madrid violated Officer Jarrott's Fourteenth

Amendment right to substantive due process.  Plaintiff states that Defendant Madrid "was

directly responsible for placing Jarrott in his vulnerable state and engaging in activity that could

produce foreseeable, rapid and deadly consequences," and that "Madrid knew or should have

known that instructing Jarrott to conduct a traffic stop of Cueva while alone and without backup

could result in Jarrott's death, and his failure to make any attempt to fully inform or assist Jarrott

evinces deliberate indifference to Jarrott's safety."  (Doc. 1) at 9.  Defendants argue that these

allegations fail to state a claim because: (1) the risk of private violence is inherent to police work,

and (2) Plaintiff's allegations are not conscience shocking in light of that inherent risk.  (Doc. 7)

at 4-10.

   The Fourteenth Amendment's Due Process Clause provides that "no State shall ...

deprive any person of life, liberty, or property without due process of law."  U.S. Const. amend.

XIV.  A substantive due process claim is based on the protection of "individual liberty against

'certain government actions regardless of the fairness of the procedures used to implement

them.'"  *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992) (quoting *Daniels v.

Williams*, 474 U.S. 327, 331 (1986)); *see also Moore v. Guthrie*, 438 F.3d 1036, 1039 (10th Cir.

2006) (explaining that the Due Process Clause creates a limited liberty interest in the protection

of an individual's bodily integrity) (collecting cases).

   In general, state actors are not obligated to protect individuals from violence perpetrated

by a private individual.  *DeShaney v. Winnebago Cnty.*, 489 U.S. 189, 195 (1989).  An exception

to this rule arises when a state actor creates or increases the danger faced by the plaintiff through

an affirmative act. *Christiansen v. City of Tulsa*, 332 F.3d 1270, 1280 (10th Cir. 2003).  The

elements of a state-created danger claim are: (1) the state actor created the danger or increased

the plaintiff's vulnerability to the danger; (2) the plaintiff was a member of a limited and

specifically-definable group; (3) the defendant's conduct put the plaintiff at substantial risk of

serious, immediate, and proximate harm; (4) the risk was obvious or known; (5) the defendant

acted recklessly or in conscious disregard of that risk; and (6) such conduct, when viewed in

total, is conscience shocking. *Estate of B.I.C. v. Gillen*, 761 F.3d 1099, 1105 (10th Cir. 2014).

### 1.  Application of State-Created Danger Theory

Where injuries are the result of a plaintiff's municipal employment, the state-created

danger theory must be considered in conjunction with well-settled authority that the Constitution

does not guarantee state actors a safe workplace. *See Collins* 503 U.S. at 126, 129 ("[T]he Due

Process Clause is not a guarantee against incorrect or ill-advised decisions[, n]or does it

guarantee municipal employees a workplace that is free from unreasonable risks of harm.").

"The friction between the protection offered by the state-created danger theory and *Collins'*

declaration that the Due Process Clause does not guarantee a safe workplace is particularly acute

where a plaintiff is injured in the course of performing law-enforcement, firefighting, and

similarly inherently-dangerous duties." *Estate of Carrigan v. Park Cnty. Sheriff's Office*, 381

F.Supp.3d 1316, 1324 (D. Colo. 2019).

"Courts have sometimes resolved this tension by considering what risks are *inherent* to a

particular job." *Id.*  When a job exposes a municipal employee to personal risk that the

employee took "willingly, in exchange for pay and fringe benefits," then the employer's "failure

to protect [the employee] from private predation is not a constitutional tort." *Id.*  For example, in

*Witkowski v. Milwaukee County*, the Seventh Circuit affirmed the dismissal of a sheriff's

8

deputy's substantive due process claim where the deputy was shot by a violent inmate at a court hearing after other deputies failed to follow protocol and properly secure the inmate.  480 F.3d 511, 512-13 (7th Cir. 2007).  The court reasoned that "[t]he state did not force [the plaintiff] into a position of danger" and noted that the two deputies did not shoot the plaintiff.  *Id.*  In contrast, in *Kedra v. Schroeter*, a state trooper was assigned to mandatory firearms training at a shooting range, where the safety trainer accidentally shot the trooper and killed him.  876 F.3d 424 (3d Cir. 2017).  The Third Circuit allowed the trooper's estate's state-created danger claim to proceed because "a government employee may bring a substantive due process claim against his employer if the state compelled the employee to be exposed to a risk of harm not inherent in the workplace."  *Id.* at 436 n.6.  The court held: "We have no trouble concluding this standard is met in the context of a mandatory firearms training in which the trainees were required to be physically present without protection, and the firearms instructor, instead of following safety protocols and demonstrating the proper use of a firearm, disregarded all protocols and fired directly at a trainee at close range."  *Id.*  Considering the contrast in these two cases, the District of Colorado, in *Carrigan*, found that "the dividing line between the state-created danger theory and *Collins* lies where the risk faced by the employee is qualitatively different from the types of risks the employee agreed to face when he or she accepted employment."  381 F.Supp.3d at 1325.

Defendants argue that the state-created danger theory cannot provide a basis for Count 1 because Officer Jarrott's death at the hands of Mr. Cueva "was within the scope of risks inherent to his job as a New Mexico State Police officer."  (Doc. 7) at 5.  Plaintiff, however, contends that the risk of danger to Officer Jarrott "was qualitatively different than what he agreed to when he accepted employment and not inherent to the job."  (Doc. 20) at 4.  Plaintiff maintains that

Officer Jarrott "was never told he would be sent in alone to stop an armed and high-risk criminal with the most vital information withheld from him, and without the benefit of armor and other protections provided to other officers involved in the operation." *Id.* at 5.  Specifically, Plaintiff asserts that Officer Jarrott did not assume the risk of being "ordered to unwittingly pull over a high-risk suspect concealing an AK-47 who just days prior had told an undercover agent that he needed the weapon 'for his protection' and because 'he was never going back to jail.'" *Id.*

To resolve this dispute, the Court finds the reasoning in *Carrigan* instructive.  In that case, members of a sheriff's office attempted to evict an individual who was known to be "armed, dangerous, and to harbor anti-government and anti-law enforcement sentiments; he was also known to have recently expressed threats to 'shoot the first cop [he] sees,' among others." 381 F.Supp.3d at 1320.  The undersheriff and other officers held a series of meetings to plan a tactical operation to evict the man and decided they would avoid entering the residence and withdraw to the perimeter if the individual entered the residence.  Despite this plan, upon approaching the residence, a captain instead chose to enter the residence with a corporal and two deputies. *Id.* at 1321.  After a short search, the individual opened fire on the officers.  The corporal and the individual were killed, and the two deputies were injured.

The corporal's estate and the two deputies filed suit against the sheriff's office, the sheriff, and the captain who ordered them to enter the residence.  In considering the plaintiffs' substantive due process claim, the court reasoned that "the risk of violence at the hands of an evictee known to be unstable and potentially violent is well within the scope of risks that are inherent to the Plaintiffs' jobs as sheriff's deputies." *Id.* at 1325.  The court explained that "the very purpose of such jobs is to deal with the sort of violent and unpredictable persons that cannot be managed through ordinary social conventions and pressures and the risks of harm at the hands

10

of such individuals are well-understood by every person who accepts a law enforcement

position." *Id.* Accordingly, the court dismissed the substantive due process claim.

Plaintiff argues the facts of this case are distinguishable from *Carrigan* because the

plaintiffs in *Carrigan* "were fully aware of the possibility that [the resident] was armed and

would fire at them; indeed, they specifically anticipated and planned for that possibility." *Id.* at

1325-26. In contrast, Officer Jarrott "was never told he would be sent in alone to stop an armed

and high-risk criminal with the most vital information withheld from him, and without the

benefit of armor and other protections provided to other officers involved in the operation."

(Doc. 20) at 5. Plaintiff emphasizes that the analysis of what risks are inherent to the job "is

rooted in the assumption that 'if the employee feels that the risks of the job—as enhanced by

reckless supervisory decisionmaking—are too severe, the employee can always choose to walk

away from the job.'" *Id.* (quoting *Carrigan*, 381 F.Supp.3d at 1325). Since Officer Jarrott was

not given all of the information about the plan to apprehend Mr. Cueva, Plaintiff submits that he

"could never make such an assessment of risk." (Doc. 20) at 5.

While the Court is sympathetic to Plaintiff's position, the Court disagrees that Officer

Jarrott was required to be aware of all of the information his supervisors had about Mr. Cueva in

order to properly weigh the risks of his job. Indeed, in *Carrigan* the district court explained that

in assessing the inherent risks of a job, the court should ask what the employee understood and

contemplated "when he or she took the job," and that "the dividing line between the state-created

danger theory and *Collins* lies where the risk faced by the employee is qualitatively different

from the types of risks the employee agreed to face *when he or she accepted employment*." 381

F.Supp.3d at 1325 (emphasis added). Accordingly, "a police officer assigned to arrest an armed

and violent suspect or a firefighter instructed to enter a burning building will always face an

increased exposure to danger than he or she had before that assignment, that risk will always be known to the supervisors making the assignment, and the decision to issue the directive will always be made in contemplation (and arguably disregard) of that risk." *Id.* at 1324. If such decision making by supervisors bears constitutional implications, even if the supervisors' decisions are "tragically flawed," then "to hold otherwise would dramatically expand the scope of judicial scrutiny of first-responder operations and would effectively convert the Constitution into the guarantee of workplace safety in violation of *Collins*." *Id.*

Plaintiff alleges that Defendant Madrid told Officer Jarrott that "a suspect might be driving eastbound on Interstate 10 in a white pickup truck, and instructed him to develop a reason to initiate a traffic stop if he saw the vehicle," and that Defendant Madrid "went over the BOLO with Officer Jarrott." (Doc. 1) at 5, 6. The BOLO asked other law enforcement agencies to look out for Mr. Cueva, and noted that "Mr. Cueva was suspected of trafficking narcotics, has an extensive criminal history, and is known to carry firearms." *Id.* at 6. Therefore, Officer Jarrott was informed that initiating a traffic stop with Mr. Cueva could be dangerous, and a dangerous traffic stop is in line with the risks Officer Jarrott understood and contemplated when he took the job. *See Carrigan*, 381 F.Supp.3d at 1324 (finding that police officers face an inherent risk of being "assigned to arrest an armed and violent suspect"); *see also Slaughter v. Mayor and City Council of Baltimore*, 682 F.3d 317, 322 (4th Cir. 2012) (dismissing substantive due process claim by estate of firefighter trainee killed during live-burn training exercise that his superiors "failed to provide [him] with safe working conditions, proper equipment, proper training, and particularized notice about risks of which Fire Department officials had actual knowledge," stating "[t]he facts alleged in this case reveal a sad story that might well support state tort claims or other state law claims, … [b]ut to treat the Fire Department's conduct as a

substantive due process violation would be to constitutionalize a state tort claim, which must

only be done in the rarest of cases"); *Robischung-Walsh v. Nassau Cnty. Police Dept*, 421 Fed.

Appx. 38, 41 (2d Cir. 2011) ("In particular, a substantive due process claim based on a municipal

defendant's asserted failure to train its employees or warn them of job-related dangers does not

allege conduct so arbitrary that it violates the right to substantive due process.") (citing *Collins*,

503 U.S. at 128); *Estate of Phillips v. District of Columbia*, 455 F.3d 397, 407 (D.C. Cir. 2006)

(dismissing plaintiff firefighter's Section 1983 claims against the fire chief even though the

chief's actions recklessly increased the intensity of fire while plaintiff was inside building

fighting it).

Based on the foregoing, the Court concludes that the risk of danger to Officer Jarrott in

this case was not qualitatively different from the types of risks he agreed to face when he

accepted employment as a law enforcement officer.  Plaintiff reasonably believes that Defendant

Madrid should have provided all of the information he had learned from the HSI briefing so that

Officer Jarrott could have made a more informed decision about whether or not to stop Mr.

Cueva, and Officer Jarrott should have been provided with the same protections as other officers

who were out seeking Mr. Cueva.  (Doc. 20) at 4-5.  Nevertheless, Plaintiff does not point the

Court to any authority that would support a finding that a law enforcement officer must be

thoroughly informed by his or supervisor, or be provided the same tactical gear or other

protection as other officers, even when the supervisor affirmatively sends that officer into a

dangerous situation.  Instead, the cases relied on by Plaintiff involve the "assumption of risk"

defense in negligence tort cases and do not discuss the interplay between the state-created danger

theory and *Collins*.  *See id.* at 4-6 (citing *Slane v. Jerry Scott Drilling Co.*, 918 F.2d 123, 127

(10th Cir. 1990), *Wells v. Colo. College*, 478 F.2d 158, 161 (10th Cir. 1973), and *Bowers v.*

13

*DeVito*, 686 F.2d 616, 618 (7th Cir. 1982)).  Accordingly, that the state-created danger theory is not applicable here and Defendant Madrid's instruction to Officer Jarrott to pull Mr. Cueva over, "even if tragically flawed," did not violate Officer Jarrott's substantive due process rights.

### 2.   Conscience-Shocking Conduct

Next, Defendants contend that even if Plaintiff's state-created danger theory implicates Officer Jarrott's substantive due process rights, Count 1 should still be dismissed because the alleged conduct is not conscience shocking.  (Doc. 7) at 8-10.  The Tenth Circuit has held that to satisfy the "shock the conscience" standard, "the plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." *Armijo By and Through Chavez v. Wagon Mound Pub. Schs.*, 159 F.3d 1253, 1262 (10th Cir. 1998) ("[T]he Supreme Court has specifically admonished that a substantive due process violation requires more than an ordinary tort.").  This standard excludes "incorrect or ill-advised government decisions."  *Uhlrig v. Harder*, 64 F.3d 567, 573 (10th Cir. 1995) (quoting *Collins*, 503 U.S. at 129).  To determine if certain conduct is conscience shocking, the Supreme Court and the Tenth Circuit suggest using "a sort of sliding scale … based on the amount of deliberation that was possible before the conduct in question."  *Carrigan*, 381 F.Supp.3d at 1326. As such, in an emergency situation with little or no time for deliberation, then "conduct in which the government official intended to cause harm and in which the state lacks any justifiable interest … will shock the conscience and result in constitutional liability."  *Radecki v. Barela*, 146 F.3d 1227, 1232 (10th Cir. 1998) (citation omitted).  On the other side of the spectrum, when the state actor has "the luxury to truly deliberate," "something less than unjustifiable intent to harm, such as calculated indifference, may suffice to shock the conscience."  *Id.*

14

Plaintiff argues that "[a] supervisor who orders his subordinate officer to stop a vehicle, but does not tell that officer the danger he is facing, should shock the conscience." (Doc. 20) at 6. "Officer Jarrott was not sent to stop Cueva under any exigent circumstances," and "[t]his was an operation that had been planned for at least several days and jointly between NMSP and federal agents." *Id.* at 7. Therefore, Plaintiff asserts that the facts of this case are different than in *Carrigan*, where the planned operation was deviated from in the heat of the moment. *Id.*

Contrary to Plaintiff's assertion, Defendant Madrid did inform Officer Jarrott about the danger he was facing because he "went over the BOLO with Officer Jarrott," and the BOLO included information that "Mr. Cueva was suspected of trafficking narcotics, has an extensive criminal history, and is known to carry firearms." (Doc. 1) at 6. While Defendant Madrid's instructions to Officer Jarrott may have been incorrect or ill-advised, especially given the precautions taken by other officers and HSI agents with regard to Mr. Cueva, even "knowingly permitting unreasonable risks to continue does not necessarily rise to the level of conscience shocking." *DeAnzona v. City & County of Denver*, 222 F.3d 1229, 1235 (10th Cir. 2000); *see also City of Sacramento v. Lewis*, 523 U.S. 833, 885 (1998) (holding that, even if the officer's "behavior offended the reasonableness held up by tort law or the balance struck in law enforcement's own codes of sound practice, it does not shock the conscience"). This is especially true given Officer Jarrott's role as a state police officer, whose duties included pulling people over at the behest of his supervisors. *See Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*, 542 F.3d 529, 543-44 (6th Cir. 2008) ("[E]ven where the governmental actor may be aware that his action poses a substantial risk of serious harm to the plaintiff, where some countervailing, mandatory governmental duty motivated that action, the action will not shock the conscience"). Accordingly, the Court concludes that Defendant Madrid's actions do not rise to the level of

calculated indifference and, therefore, are insufficient to satisfy the legal "shock the conscience" standard.

### B.  Count 2 - Supervisory Liability

Next, Defendants move to dismiss Count 2, Plaintiff's claim against Defendant Johnson for supervisory liability.  In the Complaint, Plaintiff alleges that, as NMSP Chief, Defendant Johnson was "responsible for overseeing the training and supervision of NMSP officers and implementing, upholding, and ensuring the[ir] compliance with NMSP's policies and procedures with regard to apprehending suspects while assisting other agencies."  (Doc. 1) at 10.  Plaintiff alleges that "Johnson's failure to establish and enforce" these policies and procedures, "coupled with inadequate and indifferent training and supervision, resulted in the brutal murder of Jarrott." *Id.*  Plaintiff further states that Defendant Johnson "acted willfully, wantonly, recklessly, intentionally, and with deliberate indifference in not ensuring adequate training and allowing policies and procedures in his department to go unchecked."  *Id.*

Defendants argue that these allegations are insufficient to state a claim for relief because they are conclusory and Plaintiff does not specify which policies or procedures were allegedly non-existent and which were not enforced.  (Doc. 7) at 12-14.  Defendants further contend that even if Plaintiff adequately pleaded a claim for supervisory liability, that claim must be dismissed because there is no underlying constitutional violation by Defendant Madrid or any other NMSP officer or employee.  *Id.* at 21-22.

Plaintiff responds that the Complaint sufficiently alleges that Defendant Johnson "failed to establish and enforce policies and procedures with regard to assisting other law enforcement agencies in the apprehension of suspects."  (Doc. 20) at 8.  Plaintiff states that the "policies and failures described in the Complaint include the practice of using pretextual stops, known as

16

'whisper stops,' in which a vehicle is pulled over under the pretext of a routine traffic stop, in this case to protect the identity of a confidential informant." *Id.* (citing Doc. 1 at 3-4). Plaintiff states that these types of stops are "illegal in New Mexico," and Defendant Johnson has failed to establish policies prohibiting their use. (Doc. 20) at 8.[2] Plaintiff states that Defendant Johnson also has not "established a policy that would require NMSP officers to attend any briefings or operational planning meetings if they are going to assist other agencies in the apprehension of dangerous suspects such as Cueva," and "has not established or enforced policies that would require supervisors (such as Sgt. Madrid) to approach a high risk stop (such as that of Cueva) with appropriate tactics, personnel and equipment." *Id.* at 9. Therefore, she contends, "[a]llowing an environment where an unsuspecting NMSP officer could be sent into a high-risk felony stop with the purpose of making it look like a routine traffic stop is a deliberate failure of policymaking by Chief Johnson, and one that was indifferent to Officer Jarrott's rights." *Id.*

In a Section 1983 lawsuit, a claim for supervisory liability requires that a plaintiff show "(1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation." *Brown v. Montoya*, 662 F.3d 1152, 1163-64 (10th Cir. 2011) (citation omitted). "This does not equate

---

[2] In *State v. Ochoa*, the New Mexico Court of Appeals held that the state constitution prohibits pretextual traffic stops, meaning stops made "not to enforce the traffic code, but to conduct a criminal investigation unrelated to the driving." 146 N.M. 32, 38, 206 P.3d 143, 150, 2009 NMCA-0002, ¶ 16. This case was a departure from federal precedent, where "an officer's subjective intent is not relevant regarding the reasonableness of his actions." *Hackett v. Artesia Police Dept.*, No. 08-306 MCA/RHS, 2009 WL 10681494, at *15 (D.N.M. Sept. 23, 2009) (citing *Whren v. United States*, 517 U.S. 806, 813 (1996)). *Ochoa* sets out several factors to guide courts in determining whether a stop was pretextual under the totality of the circumstances. 2009-NMCA-022, ¶¶ 39-41. Plaintiff does not elaborate on how the unlawfulness of this practice in New Mexico supports either of her claims.

to liability under a theory of respondeat superior" because a claim for supervisory liability

requires a showing of "an affirmative link between the supervisor and the constitutional

violation."  *Cox v. Glanz*, 800 F.3d 1231, 1248 (10th Cir. 2015) (citations omitted).

      While Plaintiff alleges that Defendant Johnson failed to implement policies and

procedures that caused the complained-of constitutional deprivation, and that Defendant Johnson

acted with the requisite state of mind, this claim must nevertheless fail because the Court has

found there was no underlying constitutional violation.  *See Fogarty v. Gallegos*, 523 F.3d 1147,

1162 (10th Cir. 2008) (supervisory liability requires constitutional deprivation linked to

supervisor's personal participation); *Martinez v. Beggs*, 563 F.3d 1082, 1091-92 (10th Cir. 2009)

(where individual county defendants did not violate jail inmate's constitutional rights, sheriff not

liable as a matter of law for policy, training, or supervision); *Christensen v. Big Horn Cnty. Bd.

of Cnty. Commrs.*, 374 Fed. Appx. 821, 827 (10th Cir. 2010) (absent underlying constitutional

violation, sheriff and county commissioners cannot be held derivatively liable); *Bruner-

McMahon v. Hinshaw*, 846 F. Supp. 2d 1177, 1207 (D. Kan. 2012) ("Absent an underlying

constitutional violation, plaintiffs cannot assert a supervisory liability claim.").  As the Court

concluded above that Defendant Madrid did not violate Officer Jarrott's constitutional rights,

Plaintiff's claim for supervisory liability based on that alleged violation must be dismissed.[3]

_____

[3] Even though Plaintiff's federal supervisory liability claim fails because there was no
underlying constitutional violation, whether the NMSP training program "is deficient in a
broader sense—as in negligently-designed as a matter of tort law or simply bad policy—is a
different question that does not pose the constitutional concerns that a claim under § 1983 does."
*Carrigan*, 381 F.Supp.3d at 1331 ("Arguably, if [Park County Sheriff's Office] elects to continue
its current policies and not require officers to undergo [crisis intervention training], the next
resident—not officer—injured in a standoff with PCSO officers might be able to assert a claim
for failure to train" and be able to point to the situation in this case "as demonstrating for PCSO
the need for such additional training to avoid future constitutional violations.").

### C.  Equal Protection Claim

Defendants next move to dismiss Plaintiff's claims to the extent they are based on a

denial of Officer Jarrott's constitutional right to equal protection.  (Doc. 7) at 16-21.  Defendants

argue that Plaintiff's conclusory allegations regarding Officer Jarrott's equal protection rights do

not state a facially plausible claim.  *Id.*  Plaintiff does not respond to this argument in her

response brief.

The Fourteenth Amendment provides that no state shall "deny to any person within its

jurisdiction the equal protection of the laws."  U.S. Constitution, Amend. XIV, § 1.  "Equal

protection is essentially a direction that all persons similarly situated should be treated alike."

*Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 659 (10th Cir. 2006); *see*

*also Barney v. Pulsipher*, 143 F.3d 1299, 1312 (10th Cir. 1998) ("In order to assert a viable equal

protection claim, plaintiffs must [show] that they were treated differently from others who were

similarly situated to them."); *Villanueva v. Carere*, 85 F.3d 481, 485 (10th Cir. 1996) (stating

that it is not necessary to demonstrate that the challenged action was taken solely for

discriminatory purposes; it is necessary only to prove that a discriminatory purpose was a

motivating factor).

Plaintiff refers to an equal protection claim twice in the Complaint: in Count 1, Plaintiff

states that Officer Jarrott "had a clearly established constitutional right under the Fourteenth

Amendment to not be deprived of his life and denied equal protection under the laws;" and in

Count 2, Plaintiff states that Defendant Johnson denied Officer Jarrott "his constitutional right of

equal protection under the laws."  (Doc.1) at 8, 10 (¶¶ 49, 64).  The Court agrees with

Defendants that these are conclusory allegations and Plaintiff fails to allege that Officer Jarrott

was treated differently from others for a discriminatory purpose.  The Court grants Defendants'

motion to dismiss Plaintiff's equal protection claims.  *See Robbins*, 519 F.3d at 1247 (explaining that generalized claims for the deprivation of constitutionally guaranteed rights, without plausible factual allegations supporting the claims, do not state a claim for relief under 42 U.S. § 1983).

### D.  Qualified Immunity

Finally, Defendants move to dismiss both of Plaintiff's claims on the basis of qualified immunity.  They argue that even if the Court determines that Plaintiff adequately stated a claim for relief in Counts 1 or 2, Defendants are entitled to qualified immunity because they did not violate clearly established law.  (Doc. 7) at 22-26.  Defendants assert that for Count 1, Officer Jarrott's substantive due process rights under the state-created danger theory were not clearly established at the time of the incident based on the inherent risk Officer Jarrott faced as a law enforcement officer.  (Doc. 7) at 23-25.  For Count 2, Defendants argue that Officer Jarrott's Fourteenth Amendment right to have training on interagency assistance policies was not clearly established at the time of the incident.  *Id.* at 25-26.  Plaintiff responds that Officer Jarrott's rights were clearly established at the time of his death as to both claims.  (Doc. 20) at 10-13.

Qualified immunity protects public officials from liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified immunity is available to state officials sued in their individual capacities.  *Kentucky v. Graham*, 473 U.S. 159, 166-67 (1985).  When an individual defendant raises the qualified immunity defense, the burden shifts to the plaintiff to meet a strict two-part test.  *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009).  The plaintiff must show that: (1) the officer violated a constitutional or statutory right, and (2) the

right was clearly established when the alleged violation occurred.  *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002).  A court may address these prongs in either order, but a plaintiff must satisfy both to avoid qualified immunity.  *Pearson*, 555 U.S. at 236; *Olsen*, 312 F.3d at 1304.

"Although summary judgment provides the typical vehicle for asserting a qualified immunity defense, [the Court] will also review this defense on a motion to dismiss."  *Peterson v. Jensen*, 371 F.3d 1199, 1201 (10th Cir. 2004).  "Asserting a qualified immunity defense via a Rule 12(b)(6) motion, however, subjects the defendant to a more challenging standard of review than would apply on summary judgment."  *Id.* (citations omitted).  Accordingly, "[a]t the motion to dismiss stage, it is the defendant's conduct as alleged in the complaint that is scrutinized for objective legal reasonableness."  *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014) (brackets and internal quotation marks omitted).

In recent years, the Supreme Court "has issued a number of opinions reversing federal courts in qualified immunity cases."  *White v. Pauly*, 137 S. Ct. 548, 551 (2017).  "The Court has found this necessary both because qualified immunity is important to society as a whole, and because as an immunity from suit, qualified immunity is effectively lost if a case is erroneously permitted to go to trial."  *Id.* (citations omitted).  "[T]he defense of qualified immunity gives public officials the benefit of legal doubts."  *Donovan v. City of Milwaukee*, 17 F.3d 944, 951 (7th Cir. 1994) (internal quotation marks omitted).  Thus, qualified immunity provides "ample room for mistaken judgments" and protects all but "the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335, 341, 349 (1986).

A right is clearly established if "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Anderson v.*

*Creighton*, 483 U.S. 635, 640 (1987).  "In order for a law to be clearly established, there must be

a Supreme Court or other Tenth Circuit decision on point, or the clearly established weight of

authority from other circuits must have found the law to be as the plaintiff maintains."  *Moore*,

438 F.3d at 1042 (citation omitted).  The plaintiff bears the burden of identifying "a controlling

case or robust consensus of cases" where an officer acting "under similar circumstances" to those

faced by the defendants was found to have acted unlawfully.  *D.C. v. Wesby*, 138 S. Ct. 577, 591

(2018); *Quinn v. Young*, 780 F.3d 998, 1013 (10th Cir. 2015).  While the plaintiff "does not need

to find a case with an identical factual situation," the correspondence between settled law and the

present case must be "substantial."  *Moore*, 438 F.3d at 1042; *Plumhoff v. Rickard*, 572 U.S. 765,

780 (2014) (explaining that if no controlling authority is on point, the plaintiff must identify "a

robust consensus of cases of persuasive authority") (citation omitted).  In other words, the action

at issue need not have been previously declared unlawful, but its unlawfulness must be evident in

light of preexisting law.  *Beedle v. Wilson*, 422 F.3d 1059, 1069 (10th Cir. 2005).  Unlawfulness

is generally demonstrated "when there is controlling authority on point or when the clearly

established weight of authority from other courts supports plaintiff's interpretation of the law."

*Id.* at 1069-70 (citation omitted).

      With regard to Count 1, Plaintiff argues that the state-created danger theory was clearly

established by the date of the incident, and relies on *DeShaney v. Winnebago County Department*

*of Social Services.*, 489 U.S. 189, 197 (1989), *Christiansen v. City of Tulsa*, 332 F.3d 1270, 1280

(10th Cir. 2003), and *Estate of B.I.C. v. Gillen*, 761 F.3d 1099, 1105 (10th Cir. 2014), for this

assertion.  (Doc. 20) at 11-12.  None of these cases, however, consider the state-created danger

theory in relation to *Collins'* declaration that the Due Process Clause does not guarantee a safe

workplace or whether the risks faced by a municipal employee were inherent to that employee's

job.  Plaintiff's reliance on precedent establishing the state-created danger theory in general is

not sufficient to define clearly established law for the purposes of qualified immunity.  *See*

*Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011) (explaining that courts may not "define clearly

established law at a high level of generality") (citation omitted); *Saucier v. Katz*, 533 U.S. 194,

201 (2001) (the "clearly established" inquiry "must be undertaken in light of the specific context

of the case, not as a broad general proposition"), *overruled in part on other grounds by Pearson*,

555 U.S. 223; *Pompeo v. Bd. of Regents of the Univ. of N.M.*, 852 F.3d 973, 981 (10th Cir. 2017)

(plaintiffs "must define the clearly established right at issue on the basis of the specific context of

the case").

It is instructive that in *Carrigan* the district court found no Supreme Court or Tenth

Circuit decisions that supported the plaintiffs' claims, and noted "it is doubtful that the state-

created danger theory can apply to the circumstances presented here, simply because the risk of

being injured by a third party is an inherent part of the Plaintiffs' [law enforcement] jobs."

381 F.Supp.3d at 1330.  Plaintiff argues that the *Carrigan* holding "only applies where a plaintiff

can 'choose to walk away from the job' if he feels the risks caused by 'reckless supervisory

decisionmaking are too severe,'" but "Officer Jarrott never could have weighed the enhanced

risk caused by Sgt. Madrid because the information vital to that assessment was withheld from

Officer Jarrott."  (Doc. 20) at 12 (quoting *Carrigan*, 381 F.Supp.3d at 1325).  Nevertheless,

Plaintiff fails to identify any authority that would have been sufficient to put Defendant Madrid

on notice that he was required to provide Officer Jarrott with additional information about Mr.

Cueva or provide Officer Jarrott with the same protections other officers were given.  Plaintiff,

therefore, does not meet her burden of identifying "a controlling case or robust consensus of

cases" where an officer acting "under similar circumstances" as those faced by Defendants was found to have acted unlawfully.  *Wesby*, 138 S. Ct. at 591.

In addition, none of the six decisions offered by the *Carrigan* plaintiffs are sufficiently on point to provide notice that Defendant Madrid's actions were unlawful in light of preexisting law.  Five of those cases did not involve the state-created danger doctrine.  *See Carrigan*, 381 F.Supp.3d at 1328-29.  The sixth case relied on by the *Carrigan* plaintiffs is *Robbins*, where the Tenth Circuit considered a due process claim under the state-created danger theory based on the state defendants' licensure of a daycare and assurance of the daycare's quality.  519 F.3d at 1251.  The Tenth Circuit affirmed dismissal of the plaintiffs' claim because the plaintiffs could only allege the state actors' negligence, not deliberate indifference.  *Id.* at 1251-52.  In making this decision, the Tenth Circuit noted that in a previous case it had considered whether the state may be liable for "affirmatively misleading an employee of the substantial risks in the workplace," but concluded this question did not apply because the *Robbins* plaintiffs were not employees of the state and because "the plaintiffs do not allege that defendants made any affirmative statements regarding the quality of the McKinney Daycare."  *Id.* at 1252.  The case referred to by the *Robbins* court is *Uhlrig*, where the Tenth Circuit found no constitutional violation when a state mental hospital released a violent inmate into the general population where he killed his therapist, because "hospital staff members all were warned of the general risks inherent in their jobs, [the therapist] specifically was aware of [the inmate's] background, [and] Defendants did not affirmatively mislead [the therapist] about the risks that she and her fellow workers faced as a result of such choices."  64 F.3d at 576.

Accordingly, in *Robbins* and *Uhlrig* the Tenth Circuit contemplated that an employer who misleads an employee about dangers in the workplace may be liable for claims under the

state-created danger doctrine.  Here, Plaintiff alleges in Count 1 that "Madrid failed to warn

Officer Jarrott of the danger posed by Mr. Cueva and affirmatively misrepresented to Officer

Jarrott that everything he needed to know about Mr. Cueva was in the BOLO."  (Doc. 1) at 9,

¶ 57.  While this allegation comes close to meeting the "misleading" standard for due process

liability contemplated in *Robbins* and *Uhlrig*, those decisions set a higher bar for what

constitutes an employer misleading an employee.  In *Robbins*, the Tenth Circuit emphasized that

the state's provision of a list of only one subsidized daycare center was not the same as an

"affirmative act directed specifically towards the plaintiffs sufficient to impose a duty to

protect," because the list that was provided was not inaccurate.  519 F.3d at 1252.  The court

explained that the plaintiffs' "allegations of 'lulling' and 'doing nothing' do not give rise to a

reasonable expectation of relief."  *Id.* (distinguishing *L.W. v. Grubbs*, 974 F.2d 119 (9th Cir.

1992), where the Ninth Circuit imposed liability for danger creation when the state

misrepresented to a nurse employed in a state correctional facility that she would not work with

violent sex offenders).  Similarly, Plaintiff here does not allege that the information Officer

Jarrott was given in the BOLO was inaccurate.  And in *Uhlrig* the Tenth Circuit stressed that the

plaintiff knew "of the general risks inherent" in her job, and the defendants did not affirmatively

mislead her about those risks.  64 F.3d at 576.  Again, Officer Jarrott was aware of the general

risks he faced as a law enforcement officer and Plaintiff does not allege that he was misled about

those risks.

        The Court finds that these cases do not clearly establish that Defendant Madrid's actions

were unlawful.  While Plaintiff claims Defendant Madrid "misrepresented" the facts to Officer

Jarrott, she acknowledges that Defendant Madrid went over the BOLO with Officer Jarrott,

whereby Officer Jarrott was informed that Mr. Cueva was suspected of trafficking narcotics, had

an extensive criminal history, and was known to carry firearms.  Even when viewing Plaintiff's allegations in the light most favorable to her, "[t]he court is not required to accept conclusions of law or the asserted application of law to the alleged facts."  *Hackford*, 14 F.3d at 1465; *see also Iqbal*, 556 U.S. at 678 (explaining the court is not required to accept as true legal conclusions that are masquerading as factual allegations).  Since Plaintiff has not identified authority sufficient to put Defendant Madrid on notice that his actions were unlawful in light of preexisting law, the Court concludes that Defendant Madrid is entitled to qualified immunity as to Count 1.

As for Count 2, Plaintiff does not identify any Supreme Court or Tenth Circuit authority that clearly establishes the constitutional rights of police officers to the promulgation, enforcement, or training on interagency assistance policies.  Plaintiff states that "the law protecting Officer Jarrott's right to bodily integrity and substantive process was clearly established at the time of his death," and "Chief Johnson's deliberate indifference to the known practice of unconstitutional whisper stops and other policy failures have a causal connection to Officer Jarrott's death."  (Doc. 20) at 13.  These general statements asserting Defendant Johnson's supervisory liability do not meet Plaintiff's burden to identify authority showing "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Anderson*, 483 U.S. at 640; *see also D.C.*, 138 S. Ct. at 591 (explaining the plaintiff bears the burden of identifying "a controlling case or robust consensus of cases" where an officer acting "under similar circumstances" to those faced by the defendants was found to have acted unlawfully); *Thomas v. Durastanti*, 607 F.3d 655, 669 (10th Cir. 2010) (plaintiff bears the burden of citing to requisite authority).  Accordingly, Defendant Johnson is entitled to qualified immunity as to Count 2.  *See Turner v. Oklahoma Cnty. Bd. of Cnty.*

*Comm'rs*, 804 Fed. Appx. 921, 925 (10th Cir. 2020) ("Qualified immunity also applies to supervisory liability in Section 1983 cases.").

### E.  Dismissal With Prejudice

Defendants move to dismiss Plaintiff's claims with prejudice.  (Doc. 7) at 27.  Generally, "[a] dismissal for failure to state a claim is a resolution on the merits and, therefore, is with prejudice."  *See Ostler v. Buhler*, 30 F.3d 142, *2 (10th Cir. 1994) (unpublished) (citing *Lone Star Indus. Inc., v. Horman Family Trust*, 960 F.2d 917, 920 (10th Cir. 1992)); *see also Friedlander v. Davis & Pierce*, No. 07-1016 JB/RHS, 2009 WL 1330059, at *8 (D.N.M. May 1, 2009).  In a footnote in Plaintiff's response brief regarding her supervisory liability claim, Plaintiff states that Defendant Johnson testified at a deposition in related litigation about the use of pretextual stops and "the various ways NMSP failed to protect Officer Jarrott."  (Doc. 20) at 9 n.2.  Plaintiff states: "If the Court finds the Complaint is lacking sufficient detail on these points, Plaintiff respectfully requests leave to amend her Complaint so the allegations can include specific and detailed portions of Chief Johnson's testimony."  *Id.*  Plaintiff does not explain how additional details from Defendant Johnson's deposition will bolster her claims or refute the bases for Defendants' Motion to Dismiss.  Moreover, the Court's decision assumes all facts alleged in the Complaint as true, which encompasses Plaintiff's allegations of the use of pretextual stops and Officer Jarrott's lack of protection when he pulled over Mr. Cueva.  Consequently, the Court finds no reason to vary from the general rule that dismissal of a case for failure to state a claim should be with prejudice.  *See Ostler*, 30 F.3d at *2 ("The filing of a motion to dismiss gives the plaintiff notice that his complaint is potentially deficient and the opportunity to amend his complaint to cure the alleged deficiencies.") (citing *Hall v. Bellmon*, 935 F.2d 1106, 1109-10 (10th Cir. 1991)).

27

IV.   <u>**Conclusion**</u>

The events of February 4, 2021, and Officer Jarrott's death, are unquestionably tragic. "Officer Jarrott gave his life in service to his community.  That he did so is an incalculable loss to his family as well as to his friends and colleagues in the New Mexico State Police."  (Doc. 30) at 11.  The Court acknowledges the exemplary courageousness of Officer Jarrott's actions and his dedication to his job and the public.

In applying the law to the facts alleged in the Complaint, for the reasons stated above the Court holds that Plaintiff does not state a claim for relief for either Count 1 or Count 2.  Because the risks Officer Jarrott faced were inherent to his job, Defendants did not violate Officer Jarrott's substantive due process rights under the state-created danger theory or a derivative supervisory liability claim.  Even if the Court could apply the state-created danger theory, Defendants are entitled to qualified immunity as there is no clearly established authority particularized to the facts of this case that would have informed Defendants that their actions violated Officer Jarrott's constitutional rights.

IT IS THEREFORE ORDERED that Defendants' Motion to Dismiss, (Doc. 7), is GRANTED and all of Plaintiff's claims are DISMISSED with prejudice.

IT IS SO ORDERED.

_____
KEVIN R. SWEAZEA
UNITED STAGES MAGISTRATE JUDGE
Presiding by Consent